UNITED STATES v. ALLENTOWN TERMINAL R. CO.

(District Court, E. D. Pennsylvania.   April 10, 1919.)

No. 4800.

CARRIERS ☞37—CARRIAGE OF LIVE STOCK—PENALTIES—VIOLATION OF REGU-
LATIONS.

A carrier, which delivered a shipment of hogs at the proper place ac-
cording to the car tickets before the time to unload under the Twenty-
Eight Hour Law (Act June 29, 1906 [Comp. St. §§ 5159–5161]), which
shipment the consignees refused to accept, because the car tickets made
by a connecting carrier did not agree with the bills of lading, which
called for delivery at another point, so that the time for unloading had
expired before the shipment could be redelivered, and further delay was
occasioned by the refusal of another connecting carrier to accept ship-
ment after government inspector had ordered it unloaded for rest and
feed, there was no willful disobedience of the act, or even negligence,
and the carrier is not liable for the penalty.

At Law.   Action by the United States against the Allentown Termi-
nal Railroad Company to recover a penalty for violation of the Twenty-
Eight Hour Law.   On trial by the court without a jury.   Judg-
ment entered for defendant.

Francis Fisher Kane, U. S. Atty., and Robert J. Sterrett, Asst. U.
S. Atty., both of Philadelphia, Pa.
William Clarke Mason, of Philadelphia, Pa., for defendant.

THOMPSON, District Judge.   This was a suit brought by the
United States to recover a penalty for alleged violation of Act June
29, 1906, c. 3593, 34 Stat. 607 (Comp. St. §§ 5159–5161), known as the
Twenty-Eight Hour Law.   There was no dispute as to the facts.
From the stipulation filed and the testimony of witnesses, I find them
to be as follows:

On or about August 14, 1916, 264 hogs, consigned by Henry Knight
& Son, Louisville, Ky., to Arbogast & Bastian Company, at Allen-
town, were shipped from Louisville to Pittsburgh, Pa., where they
were reshipped over the line of the defendant and connecting carriers
to East Allentown, Pa.   The owner and person in custody of the hogs
requested in writing that their time of confinement be extended to
36 hours.   They were loaded at Pittsburgh at 3 o'clock p. m. on
August 16, 1916, and were confined in the cars during transportation
until they were unloaded at East Allentown, Pa., at 12 noon on Au-
gust 18, 1916, being a period of 45 hours.   During that period they
were not unloaded, as provided by the act of Congress, for rest, water,
and feeding.

The billing called for Lehigh Valley Railroad delivery at Allentown,
but the waybills did not accompany the cars or the car tickets.   The
car tickets, through an error made by a Pennsylvania Railroad clerk
at Pittsburgh, were marked for Philadelphia & Reading delivery.   The
slaughterhouse of the consignees is reached by the Lehigh Valley
Railroad.   The consignees also have an unloading pen at Linden street,
about four city blocks away from the slaughterhouse.   The Linden

streeet pen is reached by the tracks of the defendant, running at about right angles to the Philadelphia & Reading track. The cars containing the hogs were delivered by the Philadelphia & Reading Railway to the Allentown Terminal Railroad at 12:30 a. m., August 18, 1916, on the regular interchange delivery track, known as the "tower track," located about a half mile west of Arbogast & Bastian's Linden street stock pen. The cars were moved from the "tower track" by the defendant's locomotive and placed at Linden street stock pen at 2:30 a. m. August 18, 1916. If the car tickets had conformed to the billing, the cars would not have been delivered to the defendant, but would have been delivered to the Lehigh Valley Railroad, and by it delivered at the slaughterhouse above referred to.

In billing, calling for Philadelphia & Reading delivery at Allentown, cars of hogs billed to Arbogast & Bastian are customarily delivered at their Linden street pens. Arbogast & Bastian were notified of the arrival and raised no objections to delivery at the Linden street pen until 7 a. m., 4 hours after the time limit had expired. Then they notified the agent of the Allentown Terminal Railroad that, as the cars were intended for delivery at the slaughterhouse, they would not unload at the Linden street pen, and ordered the cars delivered at the slaughterhouse on the Lehigh Valley tracks, about four squares from the Linden street pen. The railroad agent notified them that the 36-hour time limit had expired at 3 a. m. on that date. There is a Lehigh Valley transfer track connecting the Allentown Terminal tracks reaching Linden street with the Lehigh Valley tracks reaching the slaughterhouse.

The defendant moved the cars at 7:30 a. m. from the Linden street pen and delivered them to the Lehigh Valley Railroad on the transfer track at 7:45 a. m. on August 18, 1916. About 9 a. m. an inspector of the Bureau of Animal Industry notified the railroad agent that he would be obliged to feed and water the hogs, and the trainmaster for the Philadelphia & Reading Railway was then notified. He notified the agent of the Lehigh Valley Railroad to verify the information, and was advised by the Lehigh Valley Railroad agent that the railroad would not accept the hogs for delivery at the slaughterhouse, because of the refusal of the government inspector to permit further transportation without feeding and watering. If the government inspector had not stopped the shipment, the hogs would have been at the slaughterhouse within a half hour. A representative of the Philadelphia & Reading Railway Company arranged with the Central Railroad Company of New Jersey to have the hogs fed and watered at the East End yards, which are one mile from the Lehigh Valley transfer track. Owing to the congested yard conditions of the Central Railroad Company of New Jersey and the Allentown Terminal Railroad, and the fact that a special engine was required to be put in service to deliver the cars, and it was necessary for the Central Railroad of New Jersey to call in their sectionmen who were out on the road at regular duties on the track to aid in unloading the cars at the East End pens, and the fact that the tracks of the Lehigh Valley Railroad and the Central Railroad of New Jersey were at that time required to be kept open

for the movement of their express trains, the action of the government inspector resulted in the hogs not being unloaded for food, water, and rest until 12 o'clock noon August 18th, when otherwise they might have been cared for in a "humane manner" many hours earlier.

The question to be determined is whether the defendant railroad knowingly and willfully failed to comply with the provisions of the law. The fact that the hogs were delivered to the defendant company was due to the error of a clerk of the Pennsylvania Railroad Company at Pittsburgh in marking the car tickets for Philadelphia & Reading Railway delivery, instead of for Lehigh Valley delivery, in accordance with the waybills. When the cars were delivered upon the "tower track" at 12:30 a. m., the defendant was justified in delivering the cars at the Linden street pen. It did so, moreover, an hour before the expiration of the time limit, and under its obligations as a carrier, as indicated by the car tickets, its duty of taking care of the hogs was then at an end. Upon learning that the consignee refused to accept the consignment in accordance with the car tickets, but demanded performance in accordance with the waybills by delivery on the Lehigh Valley track, the defendant did what in its judgment was the best thing under the circumstances to do; that is, shifted the cars to the Lehigh Valley transfer track. The Lehigh Valley Railroad and the consignee were entirely satisfied to have the hogs shipped at once to the slaughterhouse pens, where they probably would have arrived not later than 8 o'clock a. m. The fact that they were not unloaded for feeding, watering, and rest until 12 o'clock noon was due to an unexpected situation, which compelled the Lehigh Valley Railroad to refuse to accept the hogs, and the only remedy was to carry them entirely out of their ordinary course of transportation to the East End pens of the Central Railroad of New Jersey.

There was no element of willful disobedience of the law in the action of the defendant in failing to unload the hogs prior to delivery to the consignee, for a delivery to the consignee, as it understood its obligations at the time, had been made prior to the expiration of the 36-hour period. It is apparent that the error of the clerk of another railroad company was the cause of the wrong delivery, and there was, therefore, not even negligence for which the defendant would be responsible.

Concluding that there was no failure knowingly and willfully to comply with the act, judgment will be entered in favor of the defendant.